1.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANN H. IURLANO, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) | Case No. |
| v. | ) ) | CLASS ACTION COMPLAINT |
| CONSTELLATION ENERGY GROUP, INC., MAYO A. SHATTUCK III, DOUGLAS L. BECKER, JAMES T. BRADY, JAMES R. CURTISS, FREEMAN A. HRABOWSKI III, NANCY LAMPTON, ROBERT J. LAWLESS, YVES C. DE BALMANN, LYNN M. MARTIN, JOHN L. SKOLDS, ANN C. BERZIN, MICHAEL D. SULLIVAN, MIDAMERICAN ENERGY HOLDINGS CO., and MEHC MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND MARYLAND LAW |
| Defendants. | ) | JURY TRIAL DEMANDED |

Plaintiff Ann H. Iurlano ("Plaintiff"), by her attorneys, alleges the following upon personal

knowledge with respect to herself, and upon information and belief as to all other allegations based

upon, *inter alia*, the investigation of her counsel:

**NATURE OF THE ACTION**

1.      This class action is brought on behalf of the public shareholders of Constellation Energy Group, Inc. ("Constellation" or the "Company"), against the Company and its Board of Directors (the "Board" or the "Individual Defendants"), MidAmerican Energy Holdings Co. ("MidAmerican") and MEHC Merger Sub, Inc. ("MEHC"), alleging violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), as well as breaches of fiduciary duty under Maryland law.

2.      Specifically, the Individual Defendants have attempted to solicit shareholder proxies in support of the Company's proposed sale to MidAmerican and MEHC (the "Proposed Transaction"), with a materially deficient proxy statement that contains numerous omissions of material fact concerning, *inter alia*, (i) the process resulting in the Proposed Transaction, including the alternative transactions that the Board considered; (ii) the negotiation of the terms of the Proposed Transaction, including the deal protection devices at issue; and (iii) Constellation's engagement of its two financial advisors, Morgan Stanley & Co. Incorporated ("Morgan Stanley") and UBS Securities LLC ("UBS Securities"), as well as the financial analyses that Morgan Stanley rendered.

3.      Moreover, in breach of their fiduciary duties, the Board has unfairly locked-up the Proposed Transaction by agreeing to unreasonable deal protection terms which make the Company exponentially more expensive and difficult (if not impossible) for any prospective buyer to acquire or any alternative transaction to emerge.  These terms, agreed to by the Company's Board under extreme time pressure and without review of all reasonably available information, are unduly coercive because not only are they triggered when the Merger Agreement is terminated (even in

favor of a superior transaction), but they are also triggered under certain circumstances *even when it is not*.  Thus, the Company's shareholders are necessarily compelled to approve the Proposed Transaction because the adverse effects of the terms may be realized regardless of whether they vote down the Proposed Transaction.

4.     The significance of adequate disclosure to shareholders, and the concern that these terms may spurn viable alternative transactions, is heightened as a result of recent events which suggest that the Company's shares are worth more than MidAmerican and MEHC has offered for them.  On December 2, 2008, Électricité de France International, S.A. ("EDFI"), a substantial shareholder of the Company, communicated a proposal to the Board pursuant to which it offered to acquire certain assets and bolster the Company's liquidity with an immediate billion-dollar cash investment.  Specifically, EDFI proposed (a) to purchase a 50% ownership interest in the nuclear generation and operation business of Constellation for a purchase price of $4.5 billion; (b) to make an up-front $1 billion cash investment in Constellation in the form of a nonconvertible cumulative preferred stock, which amount would be credited against the purchase price of the 50% ownership interest that EDFI has offered to acquire; and (c) to grant an asset put option pursuant to which Constellation could, at its option, sell to EDFI non-nuclear generation assets having an aggregate value of up to $2 billion.  EDFI also expressed its belief that its proposal yields an implied price of $52.00 per share for Constellation's common stock.  Unless the Board adequately considers EDFI's proposal and makes disclosure regarding its merits (or disadvantages), shareholders cannot possibly cast an informed vote on the Proposed Transaction.

5.     Accordingly, Plaintiff seeks injunctive relief compelling the Individual Defendants to comply with Section 14(a) of the Exchange Act, and satisfy their fiduciary duties under Maryland law, by disclosing all material information to shareholders in connection with the Proposed

Transaction. Plaintiff further seeks injunctive relief requiring the Individual Defendants to satisfy their fiduciary duties to ensure that the shareholders' interests are considered and protected in connection with any sale or transaction involving the Company, and that MidAmerican and MEHC are precluded from engaging in any conduct that aids and abets the Individual Defendants' breaches of fiduciary duty and other misconduct alleged herein.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under Section 14(a) of the Exchange Act [15 U.S.C. §78n(a)] and Maryland law. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331. This Court has supplemental jurisdiction over the Maryland law claims under 28 U.S.C. §1367.

7. Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of the materially misleading statements and omissions alleged herein. In addition, Constellation is incorporated and maintains its principal executive offices in Maryland.

8. In connection with the acts, conduct and other wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

## THE PARTIES

9. Plaintiff is, and has been at all relevant times, the owner of shares of Constellation's common stock.

10. Defendant Constellation is a Maryland corporation whose principal executive offices are located at 100 Constellation Way, Baltimore, Maryland 21202. Constellation describes itself as the nation's largest competitive supplier of electricity to large commercial and industrial customers

and the nation's largest wholesale power seller.  It owns a diversified fleet of 83 generating units located throughout the United States, totaling approximately 9,000 megawatts of generating capacity. The Company delivers electricity and natural gas through Baltimore Gas and Electric Company (BGE), its regulated utility in central Maryland.  The Company's common stock is publicly traded on the New York and Chicago Stock Exchanges under the symbol "CEG."  As of October 20, 2008, Constellation had more than 178 million shares of common stock outstanding.

11.    Defendant Mayo A. Shattuck III ("Shattuck") has served as the Company's President and Chief Executive Officer since 2001, and as Chairman of the Company's Board since 2002.

12.    Defendants Douglas L. Becker, James T. Brady, James R. Curtiss, Freeman A. Hrabowski III, Michael D. Sullivan, and Nancy Lampton have served as directors of the Company since 1999.

13.    Defendant Robert J. Lawless served as a director of the Company since 2002.

14.    Defendants Yves C. de Balmann and Lynn M. Martin have served as directors of the Company since 2003.

15.    Defendant John L. Skolds served as a director of the Company since 2007.

16.    Defendant Ann C. Berzin served as a director of the Company since 2008.

17.    Defendants referenced in paragraphs 9-14 are collectively referred to as the Individual Defendants.

18.    Defendant MidAmerican is an Iowa corporation with its principal executive offices located in Des Moines, Iowa.  MidAmerican is a global provider of energy services and through its energy-related business platforms, MidAmerican provides electric and natural gas service to more than 6.9 million customers throughout the world.

19.    Defendant MEHC is a Maryland corporation and is wholly-owned by MidAmerican.

MEHC was created for the purposes of effectuating the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on her own behalf and as a class action on behalf of all common shareholders of Constellation (the "Class") pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Excluded from the Class are defendants, the current and former officers and directors of any of the defendants, and, with respect to any of the foregoing, the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable.  As of October 10, 2008, the Company had 37,667 common shareholders of record. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds if not thousands of members of the Class.  Record owners and other members of the Class may be identified from records maintained by Constellation or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     There are questions of law and fact that are common to the Class and predominate over questions affecting any individual members of the Class.  These questions include, *inter alia*, the following:  (i) whether the Proxy contains materially false and/or misleading statements and omissions in violation of Section 14(a) of the Exchange Act; and (ii) whether Plaintiff and the other members of the Class would be irreparably injured in the absence of injunctive relief requiring defendants to issue additional disclosures to shareholders to render certain of the statements in the Proxy complete and otherwise non-misleading.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel

experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.  As such, a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

25.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

26.     On September 17, 2008, Constellation and MidAmerican entered into a letter agreement tentatively memorializing the terms of the Proposed Transaction, pursuant to which MidAmerican seeks to acquire each outstanding share of Constellation common stock for $26.50 in cash, representing a total value of $4.7 billion.  On September 18, 2008, the companies jointly issued a press release in which they announced their entry into the letter agreement and, further, indicated that they anticipated reaching a definitive agreement as soon as the following day.  On September 19, 2008, the companies entered into the Merger Agreement.

27.     On November 25, 2008, Constellation filed a definitive proxy statement with the SEC in connection with the Proposed Transaction (the "Proxy"), in which it announced that a shareholder

vote is scheduled to take place with respect to the Proposed Transaction on December 23, 2008.  In

the Proxy, the Board recommends that shareholders vote to approve the Proposed Transaction and

expresses its belief the Proposed Transaction "is fair to and in the best interests of Constellation

Energy."  However, shareholders cannot properly evaluate the fairness of the Proposed Transaction

unless Constellation fully discloses the circumstances that resulted in Constellation's agreement to

the Proposed Transaction.

28.     Specifically, the Proxy suggests that adverse shifts in the credit and capital market

prompted the Company's search for hundreds of millions of dollars in new equity, which opened the

door to MidAmerican's bid.  In light of EDFI's recent proposal, however, it is unclear whether the

Board could have secured a sufficient source of liquidity elsewhere without engaging in a complete

sale of the Company.  The Proxy must disclose additional information concerning this issue.

29.     Moreover, as alleged herein, the Proxy fails to disclose certain additional material

information necessary for Constellation's public shareholders to make an informed decision whether

to approve the Proposed Transaction, the significance of which is heightened because shareholders

do not have appraisal rights under Maryland law.  Specifically, the Proxy contains the following

omissions of material fact that render it materially inaccurate, incomplete and misleading:

(a)     Although the Proxy indicates that "[t]hroughout the first half of 2008,"

Constellation's management "explored a range of potential operating and financing options for the

global commodities business, including a potential sale of all or a portion of that business," it does

not disclose whether the Company had discussions with any prospective buyers.  The Proxy also

does not disclose the identities of the financial and legal advisors that assisted Constellation in

connection with these alternatives, or the terms of their engagement.  Moreover, although the Proxy

discloses that "deteriorating conditions in the global capital markets and declining credit availability"

rendered "a number of these options . . . either impractical or financially undesirable," it does not disclose whether any options remained viable, including the transactions that Constellation ultimately pursued in connection with, and including, the Proposed Transaction. This information is material to shareholders because they are unaware of the alternate transactions that Constellation considered only several months before entering into the Proposed Transaction that may reveal whether the Board could have pursued (or could still pursue) a more advantageous transaction.

(b)     The Proxy discloses that "numerous meetings and discussions" took place with EDFI, then a 4.9% shareholder of the Company, "together with outside legal and financial advisors, focusing on the possibility of EDFI making a direct equity investment" in the Company. Once again, however, the Proxy does not disclose the identities of the financial and legal advisors (other than Cleary Gottlieb Steen & Hamilton LLP) that assisted Constellation in connection with these alternatives, or the terms of their engagement. Moreover, although comprehensively discussed, the terms on which the Company requested EDFI to make an equity investment, or on which EDFI proposed to do so, are not disclosed. Instead, the Proxy indicates that, rather than make such an investment, EDFI elected to increase its stake in the Company through open market purchases – ultimately acquiring enough shares to increase its holdings to approximately 9.5%, which qualified it as a "substantial security holder" under NYSE rules. The Proxy must disclose additional information concerning the negotiations so that shareholders can fully understand why the Company was forced to look elsewhere (like MidAmerican) for funding.

(c)     Details of negotiations concerning MidAmerican's "letter of intent" must be disclosed. Indeed, although negotiations only took place over the course of three days (at most), the Proxy fails to fully disclose which terms, if any, were the subject of negotiation. In fact, it appears that Constellation never negotiated the economic terms of the Proposed Transaction, instead

accepting MidAmerican's representation that such terms were non-negotiable.  Moreover, the Proxy indicates that MidAmerican required Constellation to pay a $25 million fee to cover legal and other expenses incurred in connection with drafting documentation concerning a transaction – an ancillary term that also does not appear to have been negotiated.  Also left intact was an exclusivity provision that barred Constellation from having discussions with other potentially interested parties.

(d)      Details concerning the Board's consideration of the September 19, 2008 proposal that EDFI made along with Kohlberg Kravis Roberts & Co. L.P.  and TPG Capital, L.P.

(e)      Details of negotiations concerning the following terms of the Merger Agreement, and others, must be disclosed in order to enable shareholders to cast an informed vote with respect to the Proposed Transaction:

(i)      The "force-the-vote" provision, which requires Constellation's shareholders to vote on the Proposed Transaction regardless of whether the Board supports it.

(ii)   The material adverse effect provision.

(iii)  The closing conditions applicable to MidAmerican.

(iv)  The provision which vests MidAmerican with the sole discretion to terminate the Merger Agreement if the "net economic value" of Constellation's retail and/or wholesale businesses or assets declines by more than $400 million between June 30, 2008 and the close of the Proposed Transaction.

(v)   The operating covenants that restrict Constellation's operations between the signing of the Merger Agreement and the close of the Proposed Transaction.

(vi)  The termination fee provision, which obligates Constellation to pay a $175 million fee to MidAmerican if the Merger Agreement is terminated for any reason other than due to a breach by MidAmerican.

(vii) The other provisions discussed in the Proxy, including the non-solicitation, fiduciary out, termination and remedies provisions of the Merger Agreement.

(f)     Details of negotiations concerning the terms and conditions of MidAmerican's $1 billion investment must be disclosed because they are inexorably intertwined with the Merger Agreement and the Proposed Transaction, and could substantially and adversely affect shareholders, as follows:

(i)     If the Merger Agreement is terminated for any reason other than a breach by MidAmerican, the Series A Preferred Stock[1] that MidAmerican purchased with its $1 billion investment will automatically convert into (a) 35,506,757 shares of Constellation common stock (representing approximately 19.9% of Constellation's outstanding shares of common stock on September 22, 2008, or approximately 16.6% on an as-converted basis); and (b) $1.0 billion in aggregate principal amount of 14% Senior Notes, which will accrue interest at a rate of 14% per annum, payable monthly in cash, and mature and become due and fully payable on December 31, 2009.

(ii)    In contrast, if Constellation terminates the Merger Agreement due to a breach by MidAmerican or MEHC, the Series A Preferred Stock will not automatically convert as set forth above, but Constellation will be required, on September 22, 2010, to redeem the Series A Preferred Stock "for an amount in cash equal to 100% of the stated value for each share," plus all accrued but unpaid dividends.

(iii)   In addition, regardless of whether the Merger Agreement is terminated in accordance with the foregoing, the conversion of the Series A Preferred Stock will nevertheless

---

[1] The Proxy indicates that "the Series A Preferred Stock ranks senior to all classes of common stock of Constellation Energy and accrues dividends at a rate of 8% per annum compounding quarterly, subject to certain adjustments, and payable quarterly in cash."

occur on June 19, 2009 ("or September 19, 2009 if all conditions to the merger in the merger agreement other than those relating to regulatory approvals, debt ratings and/or required consents have been fulfilled as of June 19, 2009").

(iv)   Moreover, in the event of a default (defined to include a change of control), the 14% Senior Notes will become automatically due and payable and Constellation must make an additional payment – in the amount of 1% of the outstanding principal balance – at such time; in the event that this occurs and Constellation must cover these payments, Constellation's $2 billion credit facility will be reduced accordingly.  The 14% Senior Notes also restrict Constellation from engaging in certain corporate transactions, including a merger.

(v)   Further, in connection with MidAmerican's purchase of the Series A Preferred Stock, Constellation's Board was expanded by one member and MidAmerican was vested with the entitlement to designate a nominee for that position so long as it beneficially owns 33.3% of the Series A Preferred Stock.  In the event that the Series A Preferred Stock is converted into common stock as set forth above, MidAmerican retains the right to designate a nominee so long as it beneficially owns at least 50% of such converted common stock.  MidAmerican will have its first opportunity to designate a nominee at the Company's 2009 annual meeting of shareholders, but if it elects not to do so, "it may appoint a [non-voting] board observer who has the right to attend and participate in all meetings of, and receive all material distributed to," the Board.

(g)   The Proxy indicates that Constellation's employees and representatives periodically discussed the Company's strategic plans with credit rating agencies, but does not reveal details regarding these conversations.  This information is highly significant because a rating downgrade could have substantially affected the Company's liquidity and available funding, and

presumably pressured the Company to find alternate sources of liquidity (such as MidAmerican's investment).

(h)     While the Proxy notes that management believed that Constellation "might need to raise between $500 and $750 million of new equity to protect the company's investment-grade credit rating," it fails to fully describe the circumstances underlying such belief.  The Proxy also fails to describe the basis of certain "rumors" about the possibility that the commitment for the Company's $2 billion credit facility could be withdrawn and the effects of Lehman Brothers Holdings Inc.'s bankruptcy on Constellation's business.

(i)     The Proxy does not indicate what UBS Loan Finance LLC ("UBS Finance") will receive in exchange for its commitment to partially fund a $2 billion credit facility available to Constellation.

(j)     The Proxy also omits the following material information concerning Constellation's financial advisors:

(i)     While the Proxy indicates that Constellation engaged UBS Securities LLC ("UBS Securities") as a financial advisor, it does not disclose why the Company did not ask UBS Securities to render a fairness opinion.  The Proxy also fails to disclose the terms of UBS Securities' engagement, including the amount of its compensation and whether all or a portion of such compensation is contingent on the consummation of the Proposed Transaction.  It also fails to disclose what connection, if any, exists between UBS Securities and UBS Finance, which is partially responsible for extending a $2 billion credit facility to Constellation.  In contrast, the Proxy indicates that Morgan Stanley "will receive a fee of $20 million for its [financial advisory] services, a substantial portion of which is contingent upon the closing of the [Proposed Transaction]."  Not only is the amount of UBS Securities' compensation material because UBS Finance extends credit to

Constellation, thus raising the specter of a conflict of interest, but it is also admittedly material because the Company has disclosed similar information for Morgan Stanley.

        (ii)   Other than what the Proxy describes, it does not disclose the other services that Morgan Stanley and UBS Securities have provided, and possibly still provide, to Constellation, including substantial underwriting services.

        (iii)  The Proxy does not disclose whether any of Constellation's financial advisors or their affiliates had a business relationship with EDFI, MidAmerican or other entities involved in the process resulting in the Proposed Transaction.  For example, in a September 30, 2005 press release, UBS AG announced that it sold a 55.6% stake in Motor-Columbus to a consortium of Atel's Swiss minority shareholders, including EDFI, which "create[d] an opportunity to build a significant Swiss-European energy company with Swiss majority ownership."

        (iv)   With respect to Morgan Stanley's analyses, the Proxy fails to disclose the following information:  (a) why Morgan Stanley "assumed, without independent verification of such information," that Constellation's common shareholders "were likely to receive less than $26.50 per share in the event of the [Company's] bankruptcy"; (b) confirmation that the "party" that proposed a capital injection equal to approximately $450 million at $50.00 per share was EDFI, if, in fact, it was; (c) why Morgan Stanley failed to perform a sum-of-the-parts or other analysis of the Company (although Morgan Stanley purportedly "concluded that traditional valuation methodologies did not apply"); and (d) information concerning the financial projections that Morgan Stanley considered.

        (k)   The Proxy also does not disclose whether the Board was consulted between September 12, 2008 and September 16, 2008 with regard to Constellation's business alternatives, and similarly fails to disclose significant details regarding the events that took place during that time.

Indeed, during that period, the Proxy notes that the Company was experiencing significant problems. Moreover, on the morning of September 16, Shattuck, the Company's Chairman and CEO, engaged Morgan Stanley and UBS Securities as financial advisors.  In response to an unsolicited call from David Sokol ("Sokol"), Chairman of MidAmerican, Shattuck also arranged for Sokol to travel to Baltimore for a meeting regarding a possible transaction.  Shattuck also fielded at least one telephone call from the CEO of another company in the energy industry who indicated that his company might be interested in making an investment in Constellation, and Morgan Stanley somehow received an unsolicited telephone call from a private equity firm that was also interested in a transaction with Constellation.  The Board's involvement is not mentioned in connection with these contacts, nor is the subject matter of these discussions disclosed.

(l)     The Proxy reveals that during a meeting on the morning of September 18, 2008, the Board "unanimously ratified and approved the execution of the letter of intent and authorized payment of the $25 million fee to MidAmerican."  The Proxy also indicates, however, that following that meeting, Ann C. Berzin, a non-employee director of the Company, "advised a Constellation executive that she and her husband had long held a substantial investment in the equity of Berkshire."  The Proxy fails to reveal why she did not disclose this conflict of interest to the Board prior to its ratification of management's entry into the letter agreement.  Rather, the Proxy merely indicates that, after the fact, "[i]t was agreed she would advise the board of this interest and would abstain from voting on any transactions involving MidAmerican."

(m)     While the Proxy indicates that the Board instructed Shattuck "to raise up to $1.5 billion in additional equity on the best available terms" to Constellation, it does not disclose the parameters within which Shattuck was constrained.  Thus, for example, the Proxy does not reveal whether the Board specifically authorized Shattuck to pursue a sale of the Company.  Moreover, it

does not appear that Shattuck ever negotiated with MidAmerican – or anyone else – to obtain the $1.5 billion of equity that the Board instructed him to secure.

(n)     The Proxy fails to disclose the circumstances surrounding the NYSE's refusal to grant Constellation's September 17, 2008 request for relief from the NYSE rule that precluded EDFI from acquiring an additional 4.9% of Constellation stock without shareholder approval.  This is significant because EDFI offered to make a $450 million investment in the Company and Constellation sought to clear the way for EDFI to make an even larger investment.

(o)     Finally, on December 2, 2008, EDFI communicated a proposal to the Board pursuant to which it offered (a) to purchase a 50% ownership interest in the nuclear generation and operation business of Constellation for a purchase price of $4.5 billion; (b) to make an up-front $1 billion cash investment in Constellation in the form of a nonconvertible cumulative preferred stock, which amount would be credited against the purchase price of the 50% ownership interest that EDFI has offered to acquire; and (c) to grant an asset put option pursuant to which Constellation could, at its option, sell to EDFI non-nuclear generation assets having an aggregate value of up to $2 billion. EDFI also expressed its belief that its proposal yields an implied price of $52.00 per share for Constellation's common stock.  Because this proposal post-dates the Proxy, shareholders will not receive any information concerning its merits (or disadvantages) prior to the Proposed Transaction unless the Board makes supplemental disclosure to them.

30.     The omitted information alleged above is material to shareholders because it will enable them to cast an informed vote on the Proposed Transaction.

### COUNT I

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

31.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

32.     Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction

33.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

34.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

35.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II

**Violations of the Individual Defendants' Fiduciary Duties Under Maryland Law**

36.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

**37.**     As alleged herein, the Individual Defendants failed to act (1) in good faith; (2) in a manner they reasonably believed to be in the best interest of the corporation; and (3) with the care

that an ordinarily prudent person in a like position would use under similar circumstances. Specifically, the Individual Defendants agreed to sell Constellation without taking reasonable steps to inform themselves regarding the availability of a superior priced offer.  For example, they failed to conduct an auction of the Company or undertake other efforts to maximize shareholder value. They also did not engage in a pre-merger market check.  This failure was particularly egregious given the fact that on the same day they approved the Proposed Transaction, Constellation received an unsolicited investment proposal from EDFI and two hedge funds along with a second-step merger.

38.     Indeed, on December 2, 2008, EDFI announced an offer to purchase as much as $6.5 billion in assets from the Company.  As part of this transaction, EDFI would make an immediate cash investment in Constellation in the amount of $1 billion in exchange for the Company's issuance of preferred shares, and would further offer to purchase $2 billion in nonnuclear-generation Company assets.  According to EDFI, this proposal is superior to the Proposed Transaction in that it results in an implied valuation of the Company's common stock at $52.00 per share – a value of nearly *double* that which shareholders are offered in the Proposed Transaction.

39.     In further violation of their fiduciary duties, the Individual Defendants agreed, without requisite due diligence, to onerous deal terms in the Proposed Transaction that effectively locked the deal up in favor of MidAmerican and precluded an effective "implicit" post-market check for the Company.  While the Individual Defendants claim to have relied on the "advice" of the Company's investment advisor in approving the Proposed Transaction, the reality is that the advisor, Morgan Stanley, conceded that it did not use "traditional valuation methodologies" in rendering its "fairness opinion."

40.     As described more fully above, the Individual Defendants approved several unreasonable deal protection devices including, among others: (a) a "force-the-vote" provision in

the Merger Agreement; (b) a material adverse effect provision in the Merger Agreement; (c) closing

conditions applicable to MidAmerican; (d) a provision in the Merger Agreement which vests

MidAmerican with the sole discretion to terminate the Merger Agreement if the "net economic

value" of Constellation's retail and/or wholesale businesses or assets declines by more than $400

million between June 30, 2008 and the close of the Proposed Transaction; (e) operating covenants

that restrict Constellation's operations between the signing of the Merger Agreement and the close

of the Proposed Transaction; (f) a termination fee provision in the Merger Agreement, which

obligates Constellation to pay a $175 million fee to MidAmerican if the Merger Agreement is

terminated for any reason other than due to a breach by MidAmerican; and (g) terms in the Merger

Agreement that prevent Defendants from soliciting higher-priced offers.

41.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will

continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will

further a process that violates their fiduciary duties to Constellation's shareholders.

42.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT III

### Aiding and Abetting Violations of the Individual Defendants' Fiduciary Duties Under Maryland Law

43.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above as though fully set forth herein.

**44.**     Defendant MidAmerican knowingly assisted the Defendants' breaches of fiduciary

duty in connection with the Proposed Transaction, which, without such aid, would not have

occurred.  In connection with discussions regarding the Proposed Transaction, MidAmerican insisted

that the Defendants agree to terms that that MidAmerican knew would violate the Defendant's

fiduciary obligations to Plaintiff and the other members of the class. In connection with the Proposed Transaction.   MidAmerican also obtained sensitive non-public information concerning Constellation's operations and used that information to acquire the Company at an unfair price.

45.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

46.     Plaintiff and the members of the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action, certifying Plaintiff as a Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.     Declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C.     Enjoining the Proposed Transaction until defendants remedy the Proxy's material deficiencies and otherwise render the statements contained therein complete and non-misleading;

D.     Declaring and decreeing that the Proposed Transaction was entered into in breach of the fiduciary duties of the Defendants and is therefore unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Transaction;

E.     Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction;

F.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Constellation's shareholders;

G.      Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys and experts' fees; and

H.      Granting such other and further relief as may be just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 5, 2008

**ENGEL & ENGEL, P.A.**
A Professional Corporation


By:_____
    Hans J Phillips #24466
    11 East Lexington Street, Suite 200
    Baltimore, Maryland 21201
    Phone: (410) 727-5095
    Fax: (410) 727-1830

*Counsel for Plaintiff*

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Mark S. Reich
Joseph Russello
919 N. Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310
Fax: (302) 654-7530